(91 App. Div. 286.)

PEOPLE ex rel. CROKER v. STURGIS, Fire Com'r.

(Supreme Court, Appellate Division, First Department. February 5, 1904.)

1. CIVIL SERVICE—REMOVAL FROM OFFICE—CHARGES—EVIDENCE—SUFFICIENCY—FIRE DEPARTMENT.
　　Evidence in proceedings against relator, as chief of the fire department, before the fire commissioner, examined, and *held* insufficient to sustain the findings of the commissioner that relator was guilty of charges brought with a view to his removal from office.

2. SAME—HEARING—PREJUDICE OF COMMISSIONER.
　　Bias or prejudice on the part of the fire commissioner did not deprive him of power to hear and determine charges against the chief of the fire department, instituted for the purpose of removing him from office.

3. SAME—REFUSAL TO TAKE VACATION.
　　The chief of the fire department was not guilty of conduct unbecoming an officer in returning from his unexpired leave of absence and resuming command, as vacation is a personal privilege, that may be waived.

4. SAME—ERROR IN JUDGMENT—REMOVAL.
　　An error in judgment by the chief of the fire department in conducting operations at a fire would not be ground for removal.

5. SAME—FIRE DEPARTMENT PROPERTY—CONVERSION BY CHIEF OF DEPARTMENT.
　　Under the provision of the charter of New York City giving the fire commissioner charge of the property of that department, the chief of the fire

department was not guilty of allowing it to be converted to private use, in following the order of the commissioner, and storing hose at places removed from firehouses, and containing inflammable material.

**6. SAME—CONDUCT OF TRIAL—PREJUDICE.**

An impartial trial was not allowed the chief of the fire department, on charges of prejudicial conduct toward some of his subordinates, by excluding evidence offered by him to discredit witnesses, showing a conspiracy against him, and by admitting evidence of rumors as to his intentions toward certain subordinates, and evidence of statements made in his absence by persons purporting to speak for him.

**7. SAME.**

Evidence examined, and *held* to show that the fire commissioner's judgment was affected by bias and prejudice, so that he did not accord a fair and impartial trial to the chief of the fire department on charges against him.

**8. SAME—EVIDENCE—RULINGS—DISCRETION OF TRIBUNAL.**

While the fire commissioner, in hearing charges against an officer, is not bound by the technical rules of evidence, and has a wide latitude, the discretion cannot be exercised by admitting everything offered to sustain the charges, and excluding evidence of as high or higher character offered in rebuttal.

**9. SAME—HEARING.**

That the commissioner did not consider the incompetent evidence received, did not render the errors immaterial, as the relator was entitled to the benefit of the competent evidence in his favor that had been rejected.

**10. SAME.**

After a hearing by the fire commissioner of charges against a subordinate, it was improper for him to take up the record, in consultation with the corporation counsel and his assistants, who had conducted the prosecution, to determine what evidence was competent and might be considered in disposing of the case.

Certiorari by the people, on the relation of Edward F. Croker, against Thomas Sturgis, fire commissioner, to review an order dismissing the relator from the position of chief of the fire department. Order reversed.

See 78 N. Y. Supp. 77; 80 N. Y. Supp. 194.

In September, 1902, seven charges were preferred against the relator as chief of the fire department of the city of New York, and, after a trial had before the commissioner, he was found guilty of some of them, and dismissed from the service. The charges contained 15 specifications, of which the commissioner found the relator guilty of the following: (1) Failure to enforce the requirements of the law for safeguarding the Park Avenue Hotel, and violation of law in issuing on the 2d of October, 1899, to chiefs of battalion, an order discontinuing inspections. (2) Incompetency, in failing to protect the Park Avenue Hotel from the fire at the Seventy-First Regiment Armory on the 21st of February, 1902, and failing to cause the removal of persons from the hotel during the progress of the fire. (3) Converting public property to private use by delivering hose to the Polo Grounds on the 4th of April, 1900, and on the 29th of May, 1900, without compensation therefor. (4) Delivering hose on the 28th of April, 1900, to a lumber company of Newtown Creek, in the borough of Brooklyn, without compensation therefor. (5) Conduct prejudicial to good order and discipline in the department, by persecuting and unjustly discriminating against Chief of Battalion Terpeny, by ordering him on the 15th of March, 1900, to prevent Foreman Clifford from attending a meeting of the Firemen's Mutual Benefit Association, of which he was then president, and, upon the refusal of said chief to comply with such order, for the purpose of annoying him, daily causing his transfer from May 1, 1900, to September 17, 1900. (6) Similar prejudicial conduct in informing Battalion Chiefs Gooderson and

Burns on January 11, 1900, that it would be useless for them to take an examination which was about to be held under the civil service commission, as the position for which the examination was being held was for one man. (7) Similar prejudicial conduct in refusing in the fall of 1900 to recommend for promotion three consecutive times Officers and Firemen Fitzgerald, Link, Roxbury, and five others—thereby causing their names to be removed from the eligible list—because they had declined to join the New York Fire Department Benevolent Association. (8) Similar prejudicial conduct in willfully and maliciously seeking to force Assistant Foreman Williamson, a veteran, from the head of the eligible list, to make room for another man. (9) Conduct unbecoming an officer, in returning from his unexpired leave of absence and resuming command of the department on Monday, August 18, 1902, without notice to or consultation with the commissioner. He found the relator not guilty of the following: (1) Wrongfully ordering removed lines of hose at the Wicke fire on January 31, 1901. (2) Wrongfully ordering the return to their quarters of engine companies at the East 10th street fire on the 28th of November, 1901. (3) Sending in false reports to the commissioner on the 6th of February, 1901, as to there being a scarcity of water at the Wicke fire. (4) Conversion of public property to private use, in knowingly and corruptly, between July 1, 1899, and August 19, 1902, sending horses to the stable of the fire department to be kept; in sending wagons, etc., to the repair shops for repairs, and causing harness to be made and repaired for him at the fire department without compensation therefor. As to the remaining charges he was unable to make any finding: (1) Violation of the Constitution of the state of New York, in requesting and accepting during the year 1900 free passes from the Cunard Steamship Company, the Panama Railroad Company, the Canadian Pacific Railway Company, and the West Shore Railroad Company; during the year 1902, from the Metropolitan Street Railroad Company; and some railroads running from New York to Buffalo, in August, 1899. (2) Conduct unbecoming an officer, in falsely stating to a reporter on February 1, 1902, that the commissioner and a friend had been going to the theaters on the strength of their badges of office until refused admission at the Metropolitan Opera House. The charges were signed by William Leary, secretary of the fire department, and gave the names of witnesses, as required by rule 276, although at the trial other witnesses not named were called by the respondent. At the opening of the trial the relator's attorney objected to the commissioner conducting the same, substantially upon the ground that the charges had virtually been made by him, and that, by reason of his attitude thereto, he had prejudged the relator's guilt, and therefore, under the provisions of the charter permitting it, he should direct a deputy to take charge thereof. The objection was overruled, and the trial proceeded before the commissioner. The numerous charges and specifications, covering several years, from 1899 to 1902, inclusive, and which we have summarized, alone occupied 9 pages of the printed record, and in regard to them a great mass of testimony was taken, so that upon this appeal it became our duty to examine a record of upwards of 2,000 pages. The commissioner found the relator guilty of the specifications as above set forth, and dismissed him from the service, and he now seeks to review such action by writ of certiorari.

Argued before VAN BRUNT, P. J., and McLAUGHLIN, PATTERSON, O'BRIEN, and LAUGHLIN, JJ.

John J. Delany, for appellant.
George L. Rives, for respondent.

McLAUGHLIN, J. At the opening of the trial many preliminary objections were interposed by the relator, bearing upon the informality and insufficiency of the charges, and one of which challenged the right of the commissioner to sit as a judge. The conclusion at which we have arrived renders it unnecessary to discuss seriatim all of these objections, or the evidence bearing upon the guilt or innocence of the re-

lator, as stated in the charges. A careful consideration of the entire record shows that at the time the charges were made the commissioner entertained a decided prejudice against the relator, and, by reason of this feeling, which was in no way disguised, the relator, at the opening of the trial, objected to proceeding before him; requesting that the trial should be had before a deputy, as permitted by the charter. The request was refused, the commissioner insisting that the trial should be conducted by himself. At the beginning, therefore, of the proceeding which resulted in the relator's dismissal, we have a serious question presented, viz., whether or not the bias and prejudice which the commissioner undoubtedly entertained against the relator were so strong and of such a character as to cause him to convict the relator without any sufficient evidence of guilt. In commenting upon this feature of the case, which was presented on an application for a stay after the relator's dismissal, the learned judge at Special Term (Croker v. Sturgis, 39 Misc. Rep. 448, 80 N. Y. Supp. 194) said:

"The question here is not as to the propriety of his acting under all circumstances of the case. The question is, did he have the power? There is no doubt that he had. It is given by statute. In a similar case it has the support of authority. People ex rel. Meyer v. Roosevelt, 23 App. Div. 514 [48 N. Y. Supp. 537], affirmed in 155 N. Y. 702 [50 N. E. 1121]. * * * Bias and prejudice per se can afford no ground for a stay, just as little as bias and prejudice per se constitute a ground for reversal. It is bias and prejudice tainting or affecting the result. Grant that the respondent showed animus, or even that he prejudged the guilt of the relator; if there was nevertheless uncontradicted evidence supporting any one of the charges—evidence of a kind that would satisfy an impartial tribunal—the judgment of dismissal, based on that charge alone, would have to stand."

The initial difference between the commissioner and the relator seems to have arisen from an effort on the part of the commissioner to compel the relator to take a vacation. In this connection it appeared that on the 2d of August, 1902, the relator was granted a leave of absence for 60 days, before the expiration of which, however, he returned, and resumed his duties as chief of the fire department, for which act he was suspended by the commissioner. He protested against his suspension, and applied to the courts for reinstatement, with the result that it was finally determined that the commissioner had no authority to do what he did; the Court of Appeals saying:

"The commissioner by attempting, even in the best of faith, to impose a compulsory vacation upon the chief of the department, could not compel that officer to absent himself, and thus prevent him from discharging a statutory duty. A vacation is a personal privilege that can be waived. * * * As long as he was chief, with no charges pending against him, he could not be suspended for either a definite or indefinite period, and thus prevented from obeying the statute. While the commissioner could compel him to do his duty, he could not by an 'administrative order,' or in any other way, prevent him from doing his duty." Croker v. Sturgis, 175 N. Y. 158, 67 N. E. 307.

Here we have the beginning of what the record before us justifies us in saying seems to have been a preconceived plan on the part of the commissioner to interfere with the relator in performing his duties as chief. We say "preconceived," because, having met with opposition, we find that the commissioner, under date of September 18, 1902, wrote a letter to the mayor, in which he recites the relator's opposition to the continuance of his vacation, his suspension, the granting of a

mandamus which was being contested in the courts, and concludes with the words:

"The conduct of Chief Croker was such that I shall, as speedily as possible, prepare charges against him and bring them to an early hearing in accordance with the standing Rules and Regulations of the Department."

Pursuant to this attitude of hostility which the commissioner had apparently assumed, it seems that diligent efforts were made by him in every direction, covering practically the four preceding years during which the relator was chief, for the purpose of finding a ground or grounds upon which charges could be preferred, a trial had, and his removal accomplished. As a result of that effort, charges—including 15 specifications—were prepared, and upon which the relator was placed on trial. It is not disputed but that these charges were prepared by direction of the commissioner himself, although it appears that they were signed by a clerk or secretary in the department. As many of the charges had a bearing not only upon the honesty, integrity, and good character of the relator, but also as to his competency to discharge the duties of his office, they should have been brought promptly, if the spirit and language of the rules of the department were of any force. The first comment or criticism upon the charges arises from the fact of the staleness of most of them, and the length of time during which, if true, either wholly or in part, an untrustworthy and incompetent man was permitted to discharge the duties of a very responsible position. Some of the specifications, it will be noticed, date back to 1899; most of them to 1900; and, if our perusal of the record is correct, only two (neglect at the Armory fire, and insubordination in refusing to obey the commissioner and take an enforced vacation) to the year when the charges were made—1902. An effort was made to prove all of the charges, and, although a large number of them were rejected by the commissioner as unproved, the nature and extent thereof show the length to which the commissioner, or the "prosecution," as termed in the record, went to find some ground upon which the relator could be dismissed.

These observations naturally lead us to a consideration of the evidence presented at the trial with respect to the charges upon which the relator was found guilty. Taking them in the order as above set forth, the respondent showed that on October 2, 1899, some three years before the trial, the relator issued an order to chiefs of battalions to direct company commanders "to discontinue all inspections as called for in section 110 of the rules and regulations until otherwise ordered, except such as may be ordered from this office." The section of the rules and regulations referred to required inspections "in compliance with the provisions of chapter 378, Laws of 1897, in their respective districts in the months of January and July in each year," and reports showing whether the law had been complied with, and provided that, "in cases where reports have once been forwarded that the law has been complied with, additional reports need not be forwarded." Testimony was given that the Park Avenue Hotel had been reported as having complied with the law, and that it was a fireproof structure; and, in this connection, the relator testified that he sent out this order in obedience to oral instructions from the then commissioner of the fire

department. It also appeared that section 216 of the rules and regulations provided that the chief should "not be guilty of deception or evasion of any law, ordinance, rule, regulation or order, general special or verbal," and that section 739 of the charter provides that "the government and discipline of the fire department shall be such as the fire commissioner may, from time to time, by rules, regulations and orders, prescribe"; the rules in force to continue until modified or repealed by the commissioner. In addition to this, it also appeared that on the 18th of April, 1900 (two years before the Park Avenue Hotel fire), the relator ordered inspections "of all buildings that are nine stories or more in height," and reports which should state the location, number of stories, fire appliances, standpipes, etc., in such buildings, which order was sent in obedience to instructions from the fire commissioner. In March, 1902, the relator also sent to battalion chiefs copies of the "New Building Code," and stated that its provisions should be complied with, and violations reported. The language of the code is that all buildings "nine stories or more (or exceeding 100 feet in height)" should come under the provisions of the code as to appliances, etc. The relator testified that he did not know how the words in parenthesis, "or exceeding 100 feet in height," came to be omitted from the first letter, but that all buildings of nine stories were regarded as 100 feet in height. In performing the duties ordered by the relator, and prescribed in the code, it seems that no report was made of the fact that the Park Avenue Hotel was not provided with the requisite fire appliances. That hotel was not nine stories in height, but, according to the testimony admitted over objection and exception, it measured at one point, from roof to curb, 103 feet, and, from the curb to the top of a small structure on the roof, 124 feet. We do not think this omission, in the absence of any evidence or notice, warranted the commissioner's finding that the relator was guilty of failure to enforce requirements of law for safeguarding the hotel, and in issuing the order of October 2, 1899. That order, it will be remembered, if the relator's testimony is to be credited—and it does not seem to be disputed—was issued by direction of the then commissioner. In any event, the prior regulation which it is claimed was displaced did not require reports of inspections in the case of fireproof buildings once reported, and that hotel, it is not disputed, was reported, and was regarded as fireproof, although subsequent events proved that it was not entirely so. In addition to this, it appears that this order was superseded by an order issued the following year calling for inspections in accordance with the building code, and, although that order refers to buildings of nine stories, and omits the parenthetical words, "or over 100 feet in height," there is nothing to show that its real meaning was not to require a compliance with the code. The evidence presented as to whether the hotel was over 100 feet in height was very close, and the method of measurement was justly criticised by the relator; but whether it came under the rule or not was a matter of administration, confided to members of the force other than the chief, whose duty it was to see that the regulation was observed. It will be noticed, therefore, that there is little, if any, evidence to support the commissioner's finding on this charge.

With respect to the charge of incompetence in the management of great fires, the commissioner found him not guilty upon two specifications, but guilty upon the third, viz., the Park Avenue Hotel fire; the incompetence alleged being his failure to protect the hotel from the Armory fire, and to have the guests removed. The testimony bearing upon this subject shows that the fire at the Armory broke out in the early morning hours of a stormy night, and the streets were almost impassable by reason of the snow, ice, and water. The relator, while returning from a fire in another part of the city, was informed of the fire at the Armory; and he at once went there, and found the Armory in a mass of flames, with the high winds carrying sparks over the car sheds, immediately to the south, which contained inflammable material. He ordered his men to protect that structure, and sent a man to the Park Avenue Hotel, which was located on the opposite side of Fourth Avenue, between Thirty-Second and Thirty-Third streets, to see that the windows were closed. He knew the hotel had an iron and stone front and a brick roof, which at the time was covered with two feet of snow. His men watched the hotel, and saw that the windows were closed. His work at the Armory was obstructed, owing to the subway excavations, and he caused dynamite stored near the Armory to be conveyed into the tunnel, and protected the woodwork at the entrance from the fire. The buildings contiguous to the Armory he also protected, and so efficient was his work that no serious damage resulted to the car sheds, although the wind carried sparks as far south as Thirty-First street, where a small fire occurred. In the meantime the hotel people had sent a man to the roof, who found that sparks coming that way were extinguished in the snow. A number of the guests had dressed and descended to the corridors of the hotel, where they stood watching the Armory fire. At this time, while the elevator in the hotel was descending with other guests, smoke arose from below the elevator; and, when it was stopped at the lower floor, flames shot upward. This fire was first discovered at the foot of the elevator shaft. The relator was notified, and at once rushed into the hotel, where he found the elevator shaft a mass of flames, with fire shooting upward. He ordered a fourth alarm, and, with his men, fought his way up the stairs, which were afire, through the corridors, which were ablaze, to the roof; and the fire was extinguished, but not until a number of the guests had lost their lives. Small fires had appeared in the meantime on some of the wooden window casements, and there was conflicting evidence whether these were caused by sparks from the Armory, or by the fire from the elevator passing outward through doors and windows left open by guests of the hotel. Two theories were presented as to the cause of the fire in the elevator; one being that it was of an independent origin, and the other that it was caused by sparks from the Armory passing through a small opening, which measured 3x10 inches, in the top of the shaft, and thence falling to the bottom of the shaft, or else that such sparks passed under the hoods or flues, and then down the flues, and finally into the elevator well. It is true, as contended by the respondent, the relator did not have the guests of the hotel aroused; but it appears that three alarms had been given before he was called to the fire, and it is undisputed that, for some time before the fire in

the hotel occurred, those in charge of the hotel were well aware of the nature of the conflagration which was raging at the Armory, on the opposite side of the avenue, and had sent a man to the roof, who reported that, with snow thereon two feet deep, there was no danger. The guests themselves were many of them aware of the fire, and, as already said, had dressed and descended to the hotel corridors, where, without apparent apprehension, they were watching the Armory fire. That a fire should occur in the hotel as it did was scarcely to be expected. That a spark could enter the small opening at the top of the shaft, pass the elevator, which was then in use, and, unobserved, reach the bottom of the shaft, seems improbable, and was so characterized by expert witnesses. We think the weight of the testimony is against the theory that a spark got underneath the hood, descended, and entered the bottom of the elevator well. The commissioner, however, found that the fire did occur in one of the ways indicated, and for such result held the relator guilty of incompetency. In this connection, it must be borne in mind, the evidence shows the relator was confronted with many dangerous conditions which required his immediate attention; and, in spite of the stormy night, and the headway which the fire at the Armory had obtained, he protected the large, inflammable car sheds, occupying the most dangerous position, and the surrounding dwellings, safeguarded the wooden entrance to the subway, prevented the explosion of dynamite stored therein, and, with respect to the hotel, which he had reason to believe was fireproof, sent a man to see that the windows were closed. The commissioner commends the relator for his work in fighting the fire in the hotel, and yet holds him incompetent in the management of great fires, in not having prevented it. We think the fair inference to be drawn from the evidence is that the relator did all he could reasonably be expected to do. But, had he erred in judgment at such a time, under the authority of People ex rel. McCabe v. Fire Commissioner, 8 N. Y. St. Rep. 695, this would not be a sufficient cause for his removal. It was there said:

"The man is yet to come, who, in all emergencies, has not blundered, whether he be lawyer, juror, or judge, major general, minister, governor, crowned head, or president; and while the error committed was demonstrated, that, as to the particular subject, a failure to deal with it properly could not be denied, it has not been regarded as evidence of incapacity to discharge the duties of the position held, or to command. * * * A single error of judgment by him, assuming one to have been committed, is not sufficient evidence of the relator's incapacity to warrant his removal."

The third charge was conversion of public property to private use. Although the commissioner held that this charge was not substantiated with respect to the private use and appropriation of materials and work by the relator, he found him guilty of conversion in permitting hose to be delivered to the Polo Grounds and to a lumber company on the outskirts of Brooklyn. It was conceded the hose was delivered, but the undisputed testimony is that it was not given, sold, or loaned, but was stored at those places (to be used only by firemen) because such places contained highly inflammable material, and were both removed from firehouses. The charter provides that the commissioner has charge of all the fire department property, its disposition and location; and it was shown that the relator delivered such hose upon direction of the

commissioner. It was thus established that there was no wrong motive in what was done. On the contrary, it appears that the relator acted for the good of the service, and with authority. The charge of conversion was thus destroyed.

Another charge was that of conduct prejudicial to good order and discipline, and, with respect to the several specifications, the evidence presented shows a sharp conflict of testimony. In the first of these specifications—that the relator persecuted Chief Terpeny—the conflict is between the two men; the former denying, and the latter asserting, that orders were given over the telephone that Foreman Clifford was to be prevented from attending the meeting of the benevolent association which it was claimed the relator did not favor. The relator admitted that he had, daily, from May to September, 1900, transferred Chief Terpeny, but stated that the chief had been assigned a difficult post, and desired a change, even if it were to relieve absent chiefs temporarily, and this work was given to him, as it was at times given to others, until finally a very desirable post was vacant, to which he was assigned.

Upon the specification relative to Chiefs Gooderson and Burns there was also a conflict of testimony; these two men asserting they had spoken to the relator about the examination, and been advised not to take it, as it was for one man only, and the relator denying such conversation. It was not disputed that an invitation was sent to all chiefs to take the examination, and a number of them did so, and two men, as the result, were promoted. It also appeared that Chief Gooderson had been threatened by the relator with charges if he did not pay several debts incurred, and he admitted there was an unfriendly feeling between himself and the relator. So, too, upon the third specification—that the relator had declined in the fall of 1900 to recommend certain members of the force for promotion, owing to their refusal to join the benevolent association in which he was said to be interested—there was a conflict as to whether such pressure was exerted; the men claiming they were approached by persons who stated they represented the relator, and the relator denying that either he, or any one with the right to represent him, had made such threats, and denying that he had been influenced by any consideration in failing to recommend men other than such as were for the good of the service, and in accord with the rules of the department. In this latter connection, it appeared that a number of the men were not on the merit roll, which had been deemed a prerequisite for promotion. The fourth of the specifications related to the forcing of a veteran from the eligible list in 1900. It appears that he was removed by an order of the commissioner, and subsequently reinstated; but, though it was shown that the relator was active in seeking his removal, the explanation given was that the veteran was defective in eyesight, and had been so reported by the medical board.

Upon the charge of prejudicial conduct, we have contradictory evidence, calling for the determination of a question of fact, but at this point the manner in which the trial was conducted by the commissioner shows that the relator was not accorded a fair presentation of his side of the case. He attempted to show, for the purpose of discrediting the

principal witnesses who testified to conversations with him which he denied, that they had formed a conspiracy against him for the reason that they had failed in promotion or otherwise; but this evidence the commissioner persistently refused to receive or consider. On the other hand, however, the commissioner, over the relator's objection and exception, admitted a large amount of improper and incompetent testimony as to the rumors in the department respecting the views and intentions of the relator as to men who did not join the benevolent association mentioned, and also admitted evidence as to the statements of third persons claiming to represent the relator, but who were not produced upon the trial, which statements were made in the absence of the relator. We think that the inferences to be drawn from the testimony upon these specifications are not altogether unfavorable to the relator, and that with respect to them he was not accorded an impartial trial.

Before passing to the consideration of the manner in which the commissioner conducted the trial, it remains to say with respect to the final charge upon which the relator was adjudged guilty, viz., conduct unbecoming an officer in refusing to obey the commissioner, by not taking his entire vacation, we have the conclusion of the Court of Appeals in the proceeding brought by the relator upon his suspension (Croker v. Sturgis, supra) that the chief had a right to return and take up his work; and the commissioner on that point was in error.

We thus come to the fourth subject, as to whether, from the conclusions reached by the commissioner, and the manner in which the trial was conducted, it appears that the commissioner's judgment was affected by bias and prejudice. We have already shown, as to the first charge, of failure to enforce requirements of law for safeguarding the Park Avenue Hotel, that the evidence did not warrant the commissioner's finding; that, with respect to the conclusion that the relator was guilty of incompetence in the management of great fires, as shown by the Park Avenue Hotel fire, there was insufficient basis for such a determination; that, upon the subject of conversion of personal property, the relator fully met the charge; and that, upon the final charge on which the relator was found guilty, the Court of Appeals has expressed an opinion contrary to that of the commissioner. These conclusions of the commissioner, at variance with the evidence, can only be explained when it is recalled that he had expressed a determination to find some charges upon which to dismiss the relator, and for that purpose unearthed a number of matters which had never before, during the several years the chief was in office, provoked criticism. With respect to the charges which the commissioner was unable to find evidence to sustain, he did not, as to some of them, acquit the relator, but, while admitting they were not substantiated, stated that he was unable to make a finding. As to the charges or specifications where, as we have shown, a conflict of testimony was presented, the relator, on the one hand, was met by department rumors not brought home to any source which could be investigated, and by statements of men not named or produced at the trial; and, on the other hand, he was prevented from showing that the principal witnesses whose testimony supported the charges had formed a conspiracy against him,

which, if proved, would have tended to discredit their statements.    In addition to this, we think that no one reading the record, and noting the rulings made in the admission of evidence to prove the charges, and the exclusion of evidence having a tendency to disprove them, could fail to be convinced that the relator was not accorded a fair and impartial trial.    This not being, strictly speaking, a trial in a court of law, but one before the head of a department, who was not a lawyer, the technical rules of evidence were not applicable.    By this we do not mean that in such a case evidence may be given which would result manifestly in a mistrial, but that in a somewhat informal proceeding, such as this, the commissioner has a wide latitude as to the kind of evidence which he will receive or reject.    The discretion vested in the commissioner as to the character of the evidence to be received is not such that he could permit everything the counsel for the prosecution thought would sustain the charges, and then exclude the proof offered by the relator to rebut the inference of guilt created, where the latter was of as high, and even higher, order of evidence as that presented to support the charges.    This, however, as shown, is precisely what occurred.    Although we have not made an exact computation, we think, from our review of the record, the relator has not exaggerated in asserting that "during the whole trial several hundred objections were made by the relator's counsel, of which only four were sustained. Every objection, with the exception of two, made by the assistant corporation counsel, was sustained."    That some of these rulings, at least, could not be supported, was recognized by the commissioner himself, because, in his return to the writ, he says:

"It may be that incompetent testimony was allowed on the trial, but, after the case was closed, your respondent, after a consideration of the record, and a consultation with the corporation counsel and his assistants, who conducted the prosecution, dismissed all the incompetent testimony from his mind, based no action of his upon it, and, to a large extent, found the relator guilty, in the respects which he did, upon the relator's own testimony."

A fair comment upon what must thus be regarded as an admission of erroneous rulings made upon the trial is that, however honest the commissioner may have been in his effort to eradicate from his mind the impression or influence produced by the testimony admitted, and which at the time he deemed material to the issues on trial before him, the relator did not get the benefit of the adverse rulings which were made erroneously, and which excluded testimony tending to prove his innocence of the charges.

Another comment which we think is justified by this admission as to the manner in which the conclusion of the commissioner was reached is that there was an evident impropriety in the commissioner taking up the record with the corporation counsel and his assistants, who, as stated, "conducted the prosecution," and being, as would appear, controlled by their view as to what rulings, practically all of which were made at the trial upon their suggestion, were erroneous, and what testimony the commissioner had a right to regard as incompetent.    Having had the aid of the corporation counsel and his assistants, as was entirely proper, in examining the witnesses, and, if possible, proving the charges, there was evident impropriety in having those who had thus

been enlisted in establishing the relator's guilt consulted in the final rendition of the judgment. In a criminal or civil case, where the liberty of a person or his property is involved, or where the judge finally passes upon the facts, as here, it would be regarded as highly improper for him to surrender his own views on the facts, and be controlled by those of counsel whose duty it is to prosecute, or to whose interest it is to obtain a judgment. This trial, it is true, was not a criminal prosecution; nor did it, in a strict sense, involve a right of property. It, however, did involve the right to a position which the relator had obtained as the result of many years of service in one of the departments of the city government. As the result of the growth of the civil service system, he was protected in that position to the extent that, as long as he honestly and efficiently discharged his duties, he was safe from removal, and he could only be removed for cause after a trial. The law has been careful to throw safeguards around the public service, so as to prevent the removal of any one in such service who honestly performs his duty, and for any cause other than a breach of duty, and, to that end, requires that, before his removal, charges shall be specified, upon which the accused is entitled to a trial, and the duty is imposed upon those making the charges to sustain them by a fair preponderance of evidence.

Our conclusion upon the whole record, therefore, is that, beginning with a disagreement between the relator and the commissioner, in which the Court of Appeals has sustained the position then taken by the former, the commissioner determined upon seeking cause for the relator's dismissal, and openly expressed his determination that there should be a speedy trial for this purpose; that charges were preferred at the commissioner's instigation, taken from the relator's entire record as chief of the department, and comprising, for the most part, stale charges, which, if they could have been sustained, should not have been permitted to lie dormant for so long a time, and for which in many instances the commissioner was unable at the trial to find any foundation; that the evidence presented as to the charges did not prove the relator guilty, but, on the contrary, with respect to some of those upon which he was found guilty, he was entitled to an acquittal, and, with respect to the others, he was prevented from fairly and fully presenting his defense; and that throughout the trial the commissioner, in his rulings, and by his attitude and conclusions, manifested a prejudice and bias which affected his judgment in holding the relator guilty and dismissing him.

It follows, therefore, that the writ should be sustained, and the proceedings of the defendant annulled, with costs, and the relator reinstated.

VAN BRUNT, P. J., and O'BRIEN and LAUGHLIN, JJ., concur.

PATTERSON, J. I concur in the reversal on the ground that the evidence was insufficient to sustain any of the charges made against the relator.